IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| KALEOKALANI YAMADA, | ) | CIVIL NO. 09-00298 LEK-RLP |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| TODD THOMAS, Warden, Saguaro | ) | |
| Correctional Facility; | ) | |
| CLAYTON A. FRANK, Director, | ) | |
| Department of Safety, State | ) | |
| of Hawaii; TOMMY JOHNSON, | ) | |
| Deputy Director of | ) | |
| Corrections, Department of | ) | |
| Public Safety, State of | ) | |
| Hawaii , | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
AND DENYING A CERTIFICATE OF APPEALABILITY**

Petitioner Kaleokalani Yamada ("Petitioner" or
"Yamada") filed a petition for a writ of habeas corpus pursuant
to 28 U.S.C. § 2254 on June 29, 2009.  Pursuant to this Court's
order, Petitioner filed an amended petition on July 8, 2009
("Amended Petition").  Respondents Todd Thomas, Warden, Saguaro
Correctional Facility, Clayton A. Frank, Director, Department of
Public Safety, State of Hawai`i, and Tommy Johnson, Deputy
Director of Corrections, Department of Public Safety, State of
Hawai`i (collectively "Respondents") filed their Answer to the
Amended Petition on September 3, 2009.  Petitioner filed a Reply
Brief on October 23, 2009.  The Court finds this matter suitable

for disposition without a hearing pursuant to Rule 8 of the Rules Governing Section 2254 Cases, 28 U.S.C. foll. § 2254, and Rule 7.2(d) of the Local Rules of Practice of the United States District Court for the District of Hawaii ("Local Rules").  After careful consideration of the parties' submissions and the relevant case law, this Court DENIES the Amended Petition for the reasons set forth below.

**BACKGROUND**

I.    **Summary of Events**

In 2003, Petitioner was charged with two counts of robbery in the first degree (Counts One and Three) and one count of assault in the first degree (Count Two) in connection with a February 14, 2003 incident.  The circuit court conducted a jury trial on November 25 and 26, and December 1, 2, and 3, 2003.  The jury returned a guilty verdict on all three counts.  Petitioner moved for a new trial based on a number of grounds.  The circuit court granted the motion based solely on the fact that one of the jurors admitted to sleeping through approximately twenty percent of defense counsel's closing argument.

The government appealed.  The Hawai`i Supreme Court held that the juror misconduct was harmless beyond a reasonable doubt.  State v. Yamada, 108 Hawai`i 474, 482, 122 P.3d 254, 262 (2005) ("Yamada I").  The supreme court vacated the order granting a new trial and remanded the case for sentencing.  Id.

2

On remand, the circuit court sentenced Petitioner to concurrent terms of twenty years of imprisonment each for Counts One and Three and ten years of imprisonment for Count Two.  In addition, the circuit court ordered Petitioner to pay restitution of $760.72 for Count One and $6,981.31 for Count Three.  Judgment was entered on January 25, 2006.  State v. Yamada, 116 Hawai`i 422, 431, 173 P.3d 569, 578 (Ct. App. 2007) ("Yamada II").

Petitioner appealed.  On December 6, 2007, the Intermediate Court of Appeals of Hawai`i ("ICA") issued an opinion affirming the judgment of conviction and sentence.  Id. at 445, 173 P.3d at 592.  Yamada filed an application for writ of certiorari to the Hawai`i Supreme Court.  The supreme court denied the application on April 1, 2008.  117 Hawai`i 332, 180 P.3d 473 (2008).  Yamada did not apply for certiorari to the United States Supreme Court, and he has not filed a petition for post-conviction relief pursuant to Rule 40 of the Hawai`i Rules of Penal Procedure.

## II.  Factual and Procedural Background

### A.  February 13, 2003 Incident

On the evening of February 13, 2003, Nicholas Kaneta ("Kaneta") and his friend, Quinton Yoza ("Yoza"), were robbed and severely beaten at the Diamond Head lookout by two male assailants, one of whom wielded a baseball bat.

That night, Kaneta finished work at around 10:00 p.m. and met Yoza to rehearse for an upcoming concert.  Before practice, the two stopped by a local bar for drinks. [Transcript of Proceedings held November 25, 2003 ("11/25/03 Trans."), at 29-35.[1]]  Kaneta said that he had four beers at the bar, but he felt "perfectly fine" when they drove to one of the Diamond Head lookouts to play.  [Id. at 35-36.]  At the lookout, they sang and played guitar in peace for about an hour and a half.  [Id. at 37-38.]

At some point, Kaneta went to his car for a cigarette, when a vehicle rapidly pulled up behind his.  [Id. at 38-39.] Still leaning into his car, Kaneta heard Yoza say "oh, oh, oh," and somebody yell "something like you talking shit."  [Id. at 39.]  The last thing Kaneta saw as he turned to see the source of the commotion was a blunt object coming toward his face; he was knocked out as a result.  [Id. at 39, 45.]  The blow broke his jaw, lacerated his ear, caused bleeding on the right side of his brain, and knocked him unconscious.  Kaneta required surgery on his ear and jaw.  [Id. at 50-52, 58, 60.]  After the attack, he suffered from "bad dizzy spells" and panic attacks.  [Id. at 57.] Though these episodes subsided, at the time of the trial, Kaneta still periodically experienced them.  [Id. at 58.]  When Kaneta

---

[1] The 11/25/03 Transcript is attached as Appendices C1 to C3 to Respondents' Answer.

regained consciousness, Yoza told him, "brah, we just got jacked." [<u>Id.</u> at 48.]

According to Yoza, he saw a white, four-door car, with its lights off and its front license plate covered with a towel or T-shirt, approach the lookout quickly from the Waikiki direction and stop next to Kaneta's car. Yoza did not recognize the two people in the car. [<u>Id.</u> at 98-99.] Petitioner, who Yoza identified as the passenger in the white car, jumped out of the vehicle, and angrily yelled "you guys were talking shit, you guys were talking shit. I told him I don't know what you're talking about, never seen you before, you know, trying to calm him down. And he proceeded to walk right past me as I was sitting on the wall and sw[u]ng the bat" at Kaneta. [<u>Id.</u> at 100, 116-17.] Eventually, the assailant struck Yoza on the crown of his head, leaving Yoza dazed, and demanded his money. Yoza attempted to block the blows, but was struck at least seven times. At that point, he estimated that their faces were within six inches of each other. After Yoza gave the assailant all of his money, he pleaded with the assailant to leave him alone. [<u>Id.</u> at 105-10.] "And he said you want to die tonight - exact words were you want to fucking die tonight? And he lifted up his shirt. [Yoza] didn't bother looking, but it was a gesture as if . . . he . . . had a gun." [<u>Id.</u> at 110.]

Yoza then wrestled the assailant to the ground, causing the assailant to drop his bat, at which time Yoza heard the sound of "[l]ike an aluminum bat hitting the ground versus a wooden bat." [Id. at 101-02.] Yoza was on top of the assailant, who was struggling and face down on the road, but when car headlights became visible and the assailant's companion yelled out "we got to go," he "just sprung [Yoza] off his back like nothing. . . . and took off[.]" [Id. at 113.] Yoza flagged down a passerby in a black truck, which sped after the assailants' car in the Kahala direction. Yoza then checked on Kaneta to make sure he was breathing, told Kaneta he was going to call for an ambulance, and ran to the next lookout. After calling 911 from a nearby payphone, Yoza smoked half a marijuana cigarette to calm down. The police arrived in about five minutes, after which he and Kaneta were taken to the Queen's Medical Center where Yoza gave the police a statement and a description of the assailant. [Id. at 118-24, 129-31.]

On February 20, 2003, Yoza met with a police artist to assist in the preparation of a "composite sketch" of his assailant. [Id. at 133-35.] Then, on March 21, 2003, Detective Gordon Makishima contacted Yoza to have him view a photographic lineup. [Id. at 137.] It took Yoza two seconds to identify his assailant from the six-photograph lineup, and he was certain that the person depicted in photograph number three of the

6

photographic lineup was their assailant.  [Id. at 140-41.]

On February 14, 2003, at about 12:30 a.m., Oliko Cookman ("Cookman"), picked up his friend Alika, and drove along Diamond Head Road towards Waikiki.  [Transcript of Proceedings held November 26, 2003 ("11/26/03 Trans."), at 13-14.[2]]  Cookman drove past two males at a lookout; they were sitting on a wall next to a car and playing music.  One of the males had a guitar, and Cookman had heard them playing music at the lookout two weeks earlier.  Cookman decided to turn his car around and drive back to the lookout.  As Cookman drove back to the lookout, one of the men, who appeared bloody, ran into the road, waved them down, and asked for help.  [Id. at 14-18.]  Cookman parked his truck ten to twenty feet behind another car parked at the lookout with his headlights shining on that car.  Two men saw him, got in their car and sped away.  Cookman got a good look at the passenger before chasing the men in the car for several blocks toward Kahala.  [Id. at 18-19.]  Cookman lost sight of the car, and drove back toward the lookout.  Cookman subsequently identified Petitioner from a six-photograph lineup shown to him by Detective Makishima.  [Id. at 31-45.]

---

[2] The 11/26/03 Transcript is attached as Appendices D1 and D2 to Respondents' Answer.

**B.** **March 21, 2003 Incident**

On March 21, 2003, Petitioner was arrested by police at the University of Hawai`i shortly after he and an unknown accomplice used a baseball bat to rob two tourists in the parking lot of the Honolulu Zoo.  Police used photographs taken of Petitioner after this arrest to assemble the photographic lineup that they showed to Kaneta, Yoza, Cookman.

Prior to trial, the State moved in limine for an order allowing the introduction at trial of the March 21, 2003 arrest. Specifically, that Petitioner: (1) was in the Honolulu Zoo parking lot with an unknown accomplice and in possession of a baseball bat; (2) smashed the body and windows of a car that did not belong to him with his baseball bat; (3) yelled at the two occupants of the car to "Get out" and to "Give us money[;]" (4) stole the occupants' car and personal belongings after the occupants fled; and (5) on November 12th, 2003, pled guilty to the offense of Robbery in the First Degree.  <u>Yamada II</u>, 116 Hawai`i at 426-27, 173 P.3d at 573-74.  Petitioner, in his motion in limine, asked for the exclusion of his guilty plea and all evidence of the March 21st incident.  <u>Id.</u> at 426-27, 173 P.3d at 573-74.

The circuit court permitted the State to present evidence that (1) "on Friday, March 21, 2003, at approximately 0215 hours, the Defendant was at the Honolulu parking lot[,]" and

(2) "on Friday, March 21, 2003, at approximately 0215 hours, the Defendant was in possession of a baseball bat at the Honolulu Zoo parking lot." Id. at 427 n.5, 173 P.3d at 574 n.5.  The circuit court also permitted the following stipulation (to which a photograph of one of the recovered aluminum bats was appended) containing the facts to which University of Hawai`i security guard Albert Teixeira would testify concerning the March 21, 2003 incident:

> 1.   On March 21, 2003, at approximately 2:30 a.m., Albert Teixeira, a University of Hawaii security officer, accompanied by a female security officer, saw two males standing to the rear of a car in a University of Hawaii dormitory parking lot located at 2579 Dole Street.
> 2.   Teixeira and the other female security officer approached the two males.
> 3.   Teixeira asked both males what they were doing there, and neither male gave any response.
> 4.   Upon request, one of the males, later identified as the Defendant Kaleokalani Yamada (Yamada), followed closely by Teixeira, walked over to the car's passenger door to retrieve the car's registration documents.
> 5.   Yamada open[ed] the car's passenger-side front door, bent over, and reached into the car.
> 6.   Teixeira's flashlight was getting weak and he could not see clearly what Yamada was doing inside the car.
> 7.   Yamada straightened up and, as he did so, turned around to face Teixeira.
> 8.   Teixeira noticed that Yamada was now holding an aluminum baseball bat in both hands.
> 9.   [9 was struck by agreement]
> 10.   When the police arrived, Teixeira briefed the police on what he had observed and done, whereupon Honolulu police officers then took charge of Yamada and recovered the aluminum baseball bat shown in Exhibit "1", attached hereto.
> 11.   Later on March 21, 2003, the police took

> the photograph of Yamada that appears as
> photograph number 3 in the six-person photographic
> lineup shown by the police to Nicholas Kaneta,
> Quinton Yoza and Oliko Cookman.

Id. at 428-29 n.7, 173 P.3d at 575-76 n.7 (some alterations in original).

### C. **Trial**

Petitioner's trial took place on November 25-26 and December 1-3, 2003.  Defense witness and Petitioner's girlfriend, Lindsey Johansen ("Johansen"), testified that Petitioner arrived at her home between 9:30 and 10:00 p.m. on the evening of February 13, 2003, they watched movies and television, and Petitioner stayed the night.  [Transcript of Proceedings held December 1, 2003 ("12/1/03 Trans."), at 13-14, 16, 19.[3]]  Four other people lived in her home, but Johansen did not know if those people were at home on the evening of February 13, 2003 and she did not see any of them the next morning when she and Petitioner woke up.  [Id. at 12, 18-19.]

Greg Ho ("Ho"), the director of the Sack 'n Save store where Petitioner was employed at the time of the February 13, 2003 incident, testified that employees were required to be clean-shaven with short hair, but could have mustaches.  Ho stated that Petitioner never had the hairstyle depicted in the police sketch while working for his store.  [Id. at 54-58.]

---

[3] The 12/1/03 Transcript is attached as Appendices E1 and E2 to Respondents' Answer.

Petitioner also testified that he was at home during the evening of February 13, 2003, until he drove to Johansen's house, where he remained during the early morning hours of February 14.  He testified that he neither struck Kaneta and Yoza with a baseball bat nor robbed them, and he opined that the State was prosecuting the "wrong guy."  [Id. at 71-74, 76.]

On December 2, 2003, Petitioner moved for a mistrial based on statements made by the prosecutor during closing arguments, in which he highlighted the similarities between the March 21st and February 13th incidents.  Outside the presence of the jury, the circuit court ruled as follows:

> THE COURT: Let me tell you what the court intended.  I think I've been crystal clear.  I got after [the prosecutor] the other day and said I feel like we've been talking past each other and I made it clear again.  It came in only - the only relevance was to show the context of how the police got the photograph of - to explain to the jury.
>
> So it wasn't just out of the blue that five weeks later they found - they took Mr. Yamada's photograph.  Only to show the taking of the photograph, not as to identity.  That was what I thought in my head.  That's what I thought I said crystal clear.  I re-emphasized it the other day and that's why I got into this limiting instruction.  Is that your understanding?
>
> [DEFENSE COUNSEL]: That is my understanding, your Honor.
>
> THE COURT: And now I feel badly I let any of it in at all.  I thought it [sic] did it to allow [the prosecutor] an opportunity to say hey, we only learned about Mr. Yamada five weeks later.  That was why I did it, not to show under 404 he

11

was the same fellow that - or was not the - was or wasn't the same fellow up at Diamond Head.

So I want that clear and I'm not blaming you. Maybe I didn't explain it. I clearly had that in my mind. I thought I - remember in chambers I re-emphasized that in front of counsel, maybe not on the record. And then I again today and that's why I wanted that limiting instruction so clear so that's the court's ruling.

[PROSECUTOR]: If the court had - and I understood. I heard the limiting instruction and I read more into it than was there. If it's only to show where the pictures came from or how the picture came into the hands of the police, your Honor, does that go to identity?

THE COURT: No.

[PROSECUTOR]: So that's the part that I completely missed because that was originally why I wanted it in.

THE COURT: I know that and I think that sometimes advocates get their own mind set a certain way. I only wanted to elect - there's going to be a mugshot coming in. Number one, I didn't have to let the mugshot in. I was going to let the mugshot in; therefore, I wanted to show where the mugshot came from, came out of an unrelated incidents [sic] five weeks later at U.H., end of story.

And perhaps in hindsight, [defense counsel] shouldn't have let all those different stipulations in about the situation, but he did and I think it explains context. I'm not faulting [defense counsel]. It goes only to show how they got the mugshot, not the bat, not the closeness in the vicinity, not the hands on the bat, not the five weeks to the day.

[PROSECUTOR]: Your Honor, now you're limiting it even more. I thought you indicated that it came in to show how they got the photograph.

THE COURT: Exactly.

12

[PROSECUTOR]: And now you just said not the bat.

THE COURT: Not the two hands on the bat. They recovered a bat and as a result, they took his picture.  As a result, they showed it to the folks.

[PROSECUTOR]: It's just - well, your Honor, just based on the stipulation, my understanding was that it was relevant to identity.

THE COURT: I understand.

[PROSECUTOR]: I apologize to the extent that I am wrong and I violated the court's order.  I am apologizing.  That is not something that I would do on purpose.

THE COURT: But be that as it may, I just don't want it to happen any more and it puts us all in a tough situation during closing.  I thought I made it clear, but be that as it may, we need to go ahead with this.  The jury's ready?

[DEFENSE COUNSEL]: Your Honor, on my motion to mistrial.

THE COURT: I'm going to respectfully deny the motion for mistrial.  I've given a limiting instruction.  I gave what I think was a proper curative instruction during closing and we need to go ahead.

[Transcript of Proceedings held Dec. 2, 2003 ("12/2/03 Trans."), at 67-70.[4]]

After closing arguments, but prior to the jury stating its verdict, Petitioner again moved for a mistrial because (1) some of the jurors appeared to be asleep during closing

---

[4]   The 12/2/03 Transcript is attached as Appendices F1 and F2 to Respondents' Answer.

13

arguments, and (2) the prosecutor improperly discussed "identity and the zoo incident[.]"  [Transcript of Proceedings held Dec. 3, 2003 ("12/3/03 Trans."), at 2.[5]]  Both of the motions were denied without prejudice.  [Id. at 12-13.]

The jury found Petitioner guilty on all three counts. [Id. at 17-19.]  Before releasing them, the circuit court questioned three jury members about whether they had slept during portions of the trial.  One juror said he was "drifting" in and out through up to twenty percent of the defense's closing arguments.  [Id. at 21-23.]

Petitioner then made an oral motion for a judgment of acquittal based on the sufficiency of the evidence, which the circuit court denied without prejudice to the filing of a written motion.  [Id. at 30-32.]

Petitioner filed a motion for a new trial, based on the following grounds:

    A.   Erroneous rulings on evidence raise "legal
         cause" for a new trial; and
    B.   Juror misconduct deprived Kaleokalani Yamada
         of a Fair Trial; and
    C.   Deputy Prosecutor's violation of the Court's
         order regarding State of Hawaii's Motion in
         Limine No. 2 prejudiced Kaleokalani Yamada's
         right to a fair trial; and
    D.   The verdict appears to be so manifestly
         against the weight of evidence as to indicate
         bias, prejudice, passion, or misunderstanding
         of the charge of the court on the part of the

---

[5]  The 12/3/03 Transcript is attached as Appendix G to Respondents' Answer.

                    jury; and

     E.    A new trial is required in the interest of
           justice.

<u>Yamada II</u>, 116 Hawai`i at 430, 173 P.3d at 577.

On March 15, 2004, the circuit court granted Petitioner's motion "on the sole basis that a juror was asleep for about twenty per cent (20%) of defense counsel's closing argument, that was approximately one hour long, thus the juror was asleep for about twelve (12) minutes." <u>Id.</u> (quotation marks omitted).

**D.   <u>Yamada I</u>**

On April 12, 2004, the State filed a notice of appeal from the circuit court's order granting the motion for a new trial. On October 21, 2005, the Hawai`i Supreme Court vacated the circuit court's order, and remanded the case for sentencing. <u>Yamada I</u>, 108 Hawai`i at 482, 122 P.3d at 262. The supreme court, relying on <u>United States v. Barrett</u>, 703 F.2d 1076, *as amended*, (9th Cir. 1982), <u>State v. Kim</u>, 103 Hawai`i 285, 81 P.3d 1200 (2003), <u>State v. Pauline</u>, 100 Hawai`i 356, 60 P.3d 306 (2002), and <u>State v. Adams</u>, 10 Haw. App. 593, 880 P.2d 226 (1994), concluded that the State met its burden in establishing that the alleged deprivation of the right to a fair trial was harmless beyond a reasonable doubt. <u>Yamada I</u>, 108 Hawai`i at 478-81, 122 P.3d at 258-61.

On January 25, 2006, the circuit court sentenced Petitioner to two twenty-year terms for Counts One and Three, and a ten-year term for Count Two, all to run concurrently, and entered judgment.  _Yamada II_, 116 Hawai`i at 431, 173 P.3d at 578.  Petitioner's appeal followed.

**E.    Yamada II**

On December 6, 2007, the ICA issued its decision affirming the circuit court's sentence and judgment.  Petitioner raised the following points of error on direct appeal:

> 1.    "The court abused its discretion in allowing the State to present the evidence of the incident at the University of Hawai`i, Mr. Yamada's mug shot in the photographic lineup and the photo of the baseball bat."
>
> 2.    "There was no substantial evidence to support Mr. Yamada's conviction where the identification evidence was not of sufficient quality or probative value."
>
> 3.    "The court abused its discretion in denying Mr. Yamada's motion for mistrial where the prosecutor's blatant and intentional violation of the court's order regarding the limited purpose for the evidence of the March 21, 2003 incident constituted prosecutorial misconduct."
>
> 4.    "Mr. Yamada is entitled to a new trial based on juror misconduct where one of the jurors slept through 20 percent of his closing argument."

_Id._ at 433, 173 P.3d at 580.

16

### 1.   <u>Introduction of Evidence</u>

The ICA rejected Petitioner's argument that the circuit court abused its discretion in allowing the State to present the evidence of the March 21, 2003 incident, Petitioner's mug shot in the photographic lineup, and the photograph of the baseball bat. As to the March 21, 2003 incident, the ICA concluded that, in light of the circuit court's "concerted effort[s]" to avoid prejudice to Petitioner, the circuit court did not abuse its discretion in admitting evidence of the March 21, 2003 incident except with respect one portion of the parties' stipulation.  <u>Id.</u> at 439, 173 P.3d at 586.  The ICA held that the stipulation's reference to Petitioner's "holding an aluminum baseball bat in both hands" after being asked by security officer Texeira to retrieve the car's registration was an abuse of discretion under Haw. R. Evid. 403.  <u>Id.</u>  The ICA, however, also held that it was harmless in light of the ambiguity of the reference, the circuit court's limiting instructions about it, and the strength of the evidence against Petitioner.  <u>Id.</u>

The ICA also ruled that the use of the photographic lineup mug shot was not reversible error because the photographic lineup did not imply that Petitioner had a prior criminal record and was not propensity evidence.  <u>Id.</u> at 440-41, 173 P.3d at 587-88.

2.  **Sufficiency of the Evidence**

The ICA also rejected Petitioner's argument that there was insufficient evidence to identify him as the perpetrator, including a lack of physical evidence.  It concluded that there the State presented ample evidence of Petitioner's guilt and that the jury's verdict represented its determination that it did not believe Petitioner's alibi evidence from his girlfriend and the testimony of his then-employer regarding Petitioner's appearance. The ICA declined either to re-evaluate the conflicting evidence or to interfere with the jury's determination of the witnesses' credibility.  The ICA therefore held that there was substantial evidence adduced at trial to support the jury's verdict.  Id. at 442, 173 P.3d at 589 (some citations omitted).

3.  **Motion for Mistrial As to March 21, 2003 Incident**

Next, the ICA rejected Petitioner's argument that the circuit court abused its discretion when it denied his motion for a mistrial based on prosecutorial misconduct.  It recognized that the prosecutor's comments were improper because they exceeded the scope of the circuit's rulings.  The ICA, however, held that comments did not deprive Petitioner of a fair trial because, inter alia: the circuit court immediately issued a limiting instruction; the circuit court ordered the jury to disregard the prosecutor's inappropriate comments; and there was ample evidence to support the jury's verdict.  The ICA therefore held that the

circuit did not abuse its discretion when it denied Petitioner's motion for a mistrial.  Id. at 444, 173 P.3d at 591.

### 4.   Juror Misconduct

Finally, with respect to the sleeping juror, the ICA found that Petitioner had not presented any circumstances which would justify revisiting the supreme court's ruling on the issue. Id. at 445, 173 P.3d at 592.

## III. Habeas Proceeding

### A.   Habeas Petition

Petitioner filed his original Petition on June 29, 2009.  On June 30, 2009, this Court ordered Petitioner to amend the Petition to name the proper respondent.  Petitioner complied and filed the Amended Petition on July 8, 2009.  The Amended Petition alleges four grounds of relief: (1) lack of substantial evidence to identify Petitioner as the perpetrator; (2) improper "bad act" evidence from an unrelated case; (3) prosecutorial misconduct regarding the "bad act" evidence; and (4) juror misconduct.  [Amended Petition at 3.]

With respect to the first ground, Petitioner argues that, at trial, the State's witnesses gave descriptions of the perpetrator that were inconsistent with their previous statements and inconsistent with the descriptions given by other witnesses. [Id. at 6.]

As to the second ground, Petitioner claims that the circuit court erred when it allowed the State to present evidence that Petitioner was involved in another robbery and taken into custody. [Id. at 8.] "As a result of that incident, a mug shot photograph of Mr. Yamada was taken and a photograph of a baseball bat was also obtained.  These items were presented to the jury." [Id.]

In his third ground for relief, Petitioner asserts that the prosecutor "intentionally violated the trial court's order of 'limited' admissibility regarding the earlier incident where the mug shot photograph and baseball bat photograph were obtained." [Id. at 9.]  According to Petitioner, the prosecutor improperly argued that "the evidence of the earlier incident was propensity evidence[.]"  [Id.]

Finally, Petitioner labels his fourth ground as juror misconduct, based on one juror sleeping through twenty percent of defense counsel's closing argument.  [Id. at 11.]

## B.   Respondents' Answer

Respondents deny that Petitioner's conviction, sentence, and custody are in violation of federal law, and Respondents assert the following affirmative defenses: (1) the Amended Petition is time-barred under 28 U.S.C. § 2254(d)(1)(A); (2) there is no federal claim asserted in the Amended Petition; and (3) federal claims were not exhausted in state court.

Alternatively, Respondents argue that the claims asserted in the Amended Petition are without merit.

Respondents argue that this habeas action is time-barred because the one-year statute of limitations began to run on July 1, 2008 and expired before Petitioner filed his Amended Petition on July 8, 2009.  Respondents claim that equitable tolling does not apply in this instance.  [Answer, Mem. in Opp. to Amended Petition ("Answer Mem.") at 20-21.]

Next, Respondents assert that Petitioner presents no federal question because, in the four grounds for relief enumerated in the Amended Petition, Petitioner does not mention "the United States Constitution or federal case law, nor does he label his claims as being 'federal' in nature."  [Id. at 22 (citation omitted).]  Accordingly, Respondents urge dismissal of the Amended Petition for failure to assert any federal claim as required by 22 U.S.C. § 2254(a).  [Id.]

Respondents also claim that Petitioner failed to exhaust any federal claim in state court.  On direct appeal, Petitioner's argument regarding insufficiency of the evidence was "based entirely upon state case law and state statutes," [id. at 23,] although it concluded by referencing the Sixth Amendment of the United States Constitution.  Respondents argue that such reference did not alert the state court that he was asserting a federal claim based on insufficient identification evidence.

21

[Id. at 23-24.] As to Petitioner's second claim regarding the introduction of evidence of the second robbery, including his mug shot and the photograph of the bat, Respondents claim that Petitioner's appeal was "based entirely upon the Hawaii Rules of Evidence and state case law," but referenced the "rights to due process and a fair trial" pursuant to the Fifth and Fourteenth Amendments to the United States Constitution. [Id. at 24.] Petitioner's third claim regarding prosecutorial misconduct made no mention of the United States Constitution, and relied solely on state law, according to Respondents. [Id. at 25.] Finally, with respect to Petitioner's arguments on appeal regarding the sleeping juror, Respondents argue that the claim was based solely on state law, but included a cursory reference to the Sixth Amendment of the United States Constitution. [Id.]

With respect to the first, second, and fourth grounds, Respondents claim that Petitioner's "fleeting and ambiguous references to the United States Constitution" could not sufficiently apprise the Hawai`i appellate courts that he was asserting federal claims on direct appeal. [Id.] In the alternative, Respondents argue that the Amended Petition is "mixed," as Petitioner's third claim contains no reference to federal law. [Id. at 26.] If the Amended Petition is "mixed," Respondents acknowledge that Petitioner "may qualify for a stay to allow [him] to return to the state court to exhaust his

22

unexhausted claims." [Id.]  They argue, however, that the
statute of limitations would have expired by the time he returned
to federal court, therefore, Petitioner's only option is to
discharge his unexhausted claims and proceed on his exhausted
claims.  [Id.]

Finally, Respondents address the merits of each of
Petitioner's four claims, and argue that, under 22 U.S.C.
§ 2254(d)(2), the Hawai`i appellate courts' rulings were
reasonable determinations of the facts in light of the evidence
presented.

C.   **Petitioner's Reply**

In his Reply, Petitioner states that his original
Petition was filed on June 29, 2009, before the one-year
limitations period ran on July 1, 2009.  He argues that the
Court-ordered Amended Petition is not untimely because it relates
back to the filing date of the original Petition.  [Reply at 2.]

As to Respondents' arguments regarding federal claims,
Petitioner states that he specified the supporting facts for each
ground underlying his claims that were labeled as "federal" in
response to Instruction 12 on page six of the Amended Petition.
[Id. at 3.]  Petitioner next summarily states that he notified
the Hawai`i appellate courts that he was asserting federal claims
on direct appeal, but does not address Respondents' arguments
regarding whether the Amended Petition is "mixed" or not.  [Id.

at 5.]  Last, Petitioner states, without further explanation,
that "a thorough examination of the State Court record reveals
Petitioner's United States Constitutional rights have been
violated."  [Id.]

## **STANDARD**

A district court may not grant a petition challenging a
state conviction or sentence on the basis of a claim that was
reviewed on the merits in state court unless the state court's
adjudication of the claim:

> (1) resulted in a decision that was contrary
> to, or involved an unreasonable application of,
> clearly established Federal law, as determined by
> the Supreme Court of the United States; or

> (2) resulted in a decision that was based on
> an unreasonable determination of the facts in
> light of the evidence presented in the State court
> proceeding.

28 U.S.C. § 2254(d); see also Williams v. Taylor, 529 U.S. 362,
402-04 (2000).  For purposes of § 2254(d)(1), "[c]learly
established Federal law" is "the governing legal principle or
principles set forth by the Supreme Court at the time the state
court renders its decision[,]" Lockyer v. Andrade, 538 U.S. 63,
71-72 (2003) (citations omitted), and refers to the holdings,
rather than the dicta, of the Supreme Court's decisions.
Williams, 529 U.S. at 412.

Under the "contrary to" clause of § 2254(d)(1), a
federal court may grant relief only when the state court "applies

24

a rule that contradicts the governing law set forth in [the United States Supreme Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme] Court but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citations omitted).

Under the "unreasonable application" clause, a federal court may grant relief only "if the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. The "unreasonable application" clause of § 2254(d)(1) applies if the state court cited the correct Supreme Court principles, but applied them to the facts of the prisoner's case in an objectively unreasonable manner. Id. at 407, 409; see also Brown, 544 U.S. at 141. Although only Supreme Court caselaw is binding, Ninth Circuit precedent is "relevant persuasive authority in determining whether a state court decision is objectively reasonable." Chia v. Cambra, 360 F.3d 997, 1002-03 (9th Cir. 2004) (citation and quotation marks omitted).

## DISCUSSION

### I.   Statute of Limitations

In the present case, Petitioner was required to file his application for writ of habeas corpus within one year of "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such

review[.]"  28 U.S.C. § 2244(d)(1)(A).  The Hawai`i Supreme Court denied Petitioner's application for a writ of certiorari on April 1, 2008.  Petitioner did not seek a writ of certiorari from the United States Supreme Court.  His conviction therefore became final ninety days later, on June 30, 2008.  See Clay v. United States, 537 U.S. 522, 527 (2003).  The statute of limitations began to run the next day, and, barring statutory or equitable tolling, expired one year later, on July 1, 2009.

Respondents argue that the Amended Petition, filed on July 8, 2009, was untimely and that Petitioner has not established that the one-year statute of limitations period should be equitably tolled.  [Answer Mem. at 21.]  Respondents' argument is misplaced.

Petitioner timely filed the original Petition on June 29, 2009, within the one-year statute of limitations period.  On June 30, 2009, this Court ordered Petitioner to amend the Petition to name the proper respondent.  The Court cautioned Petitioner that he could not amend the Petition in any other respects.  The Court gave Petitioner until July 8, 2009 to amend the Petition.  Petitioner complied with this Court's order and filed the Amended Petition on July 8, 2009.  The Court therefore FINDS that the Amended Petition is not barred by the one-year statute of limitations period.

II. **Federal Claims**

Respondents' second argument is that the Amended Petition fails to assert a federal claim.  A habeas petitioner can indicate the federal basis of his claim by citing the applicable federal law, citing a case deciding a similar claim on federal grounds, or by merely calling the claim a "federal" claim.  Baldwin v. Reese, 541 U.S. 27, 32 (2004).

The Amended Petition lists the four grounds for relief asserted by Petitioner in response to instructions on the Court's form AO 241, which states: "For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties **of the United States**. . . . State the facts supporting each ground."  [Amended Petition at 6 (emphasis added).[6]]

These instructions expressly limit the Petitioner's grounds to federal claims, *i.e.*, in violation of the Constitution, laws, or treaties of the United States.  That is, the grounds listed below the form's instructions are listed are exclusively "federal claims."  See Baldwin, 541 U.S. at 32.

The Court FINDS that the Amended Petition sufficiently asserts a federal claim.  The Court next turns to whether

---

[6] The Amended Petition was submitted on the Court's form AO 241 (Rev. 10/07), "Petition under 28 U.S.C. 2254 for Writ of Habeas Corpus by a Person in State Custody," available at: http://www.hid.uscourts.gov/forms/AO_241_1007.pdf.

Petitioner exhausted his federal claims in state court.

## III. **Exhaustion**

The exhaustion of available state remedies is ordinarily a prerequisite to obtaining federal habeas corpus relief.  28 U.S.C. § 2254(b)(1)(A); Baldwin, 541 U.S. at 29.  A petitioner has not "exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented." § 2254(c).  In order to exhaust available state remedies, a petitioner must "fairly present" his federal claim "in each appropriate state court (including a state supreme court with powers of discretionary review)[.]" Baldwin, 541 U.S. at 29.  A court may also deem a petitioner's claims exhausted if he demonstrates that there are no remaining state remedies available to adequately address the violation of his rights.  § 2254(b)(1)(B), (c); Johnson v. Zenon, 88 F.3d 828, 829 (9th Cir. 1996).

Petitioner explicitly referenced the federal sources of his claims in his briefing on direct appeal.  In his Statements of Points of Error, Petitioner asserted violations of the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution with respect to the four grounds for relief asserted in the Amended Petition.  [Opening Brief of Defendant-Appellant,

filed July 5, 2006, at 12-19.[7]]  That is, his briefing to the ICA included references to the federal sources of his claims.  See Jones v. Smith, 231 F.3d 1227, 1231 (9th Cir. 2000) (holding that once the habeas petitioner's state court brief makes an explicit reference to the federal source of his claim, the exhaustion requirement is satisfied even if the argument relied predominately on state law).  The Court therefore FINDS that the exhaustion requirement is satisfied here with respect to each of Petitioner's grounds for relief.  The Court now turns to the merits of Petitioner's claims.

## IV.  Merits

### A.  Ground One: Insufficiency of Evidence

Petitioner claims there was a lack of substantial evidence adduced at trial to identify him as the perpetrator. According to Petitioner, the State's witnesses gave inconsistent statements regarding the perpetrator's physical appearance. [Amended Petition at 6.]

When presented with an insufficiency of the evidence claim on habeas review, a federal court must determine whether, viewing the evidence and the inferences to be drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a

---

[7] Petitioner's Opening Brief on direct appeal is attached as Exhibit H to Respondents' Answer.

reasonable doubt.  Coleman v. Johnson, 132 S. Ct. 2060, 2064 (2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781 (1979)).  This inquiry does not require the federal habeas court to substitute its own judgment for that of the trier of fact.  Jackson, 443 U.S. at 318-19; see also Juan H. v. Allen, 408 F.3d 1262, 1278 n.14 (9th Cir. 2005) ("It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").  The district court should look to state law to establish the elements of the crime, "and then turn to the federal question of whether the [state court] was objectively unreasonable in concluding that" sufficient evidence supported the conviction.  Juan H., 408 F.3d at 1278 n.14 (citing Jackson, 443 U.S. at 324 n.16, 99 S. Ct. 2781).

On direct appeal, the ICA held that the State presented ample evidence supporting Petitioner's guilt.  It reviewed the sufficiency of evidence on appeal under the following standard:

> Evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury.  The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

> State v. Richie, 88 Hawai`i 19, 33, 960 P.2d 1227, 1241 (1998) (quoting State v. Quitog, 85 Hawai`i 128, 145, 938 P.2d 559, 576 (1997)) (brackets omitted).

<u>Yamada II</u>, 116 Hawai`i at 441, 173 P.3d at 588.  It then applied

this standard to the evidence adduced at trial.

> First, both Yoza and Cookman identified Yamada as one of the assailants both in and out of court. Second, police produced a very accurate sketch based on Yoza's description.  Indeed, Detective Makishima commented that it was extremely unusual for the sketch to be so accurate.  Third, there was ample light for Yoza and Cookman to see Yamada.  The moon was nearly full, there were two nearby street lamps, and Cookman testified that he had shined his car's headlights on the assailants.
>
> Finally, Yamada's defense hinged on his alibi that he and his girlfriend had spent the evening together.  Yamada's only other witness was his then-employer, who testified that the company policy regarding appearance contradicted the State's witnesses' descriptions of the assailant. The jury, however, believed the testimony of the State's witnesses over that of the Defense's. Therefore,
>
> > the verdict represented the jury's determination that Defendant's evidence was not believed, i.e., it did not raise any reasonable doubts of Defendant's guilt and, on the other hand, that the State's witnesses were believed.
> >
> > . . . .
> >
> > Thus, on appeal, this court will not attempt to reconcile conflicting evidence, or interfere with a jury decision based on the credibility of witnesses or the weight of the evidence.
>
> <u>State v. Gabrillo</u>, 10 Haw. App. 448, 457, 877 P.2d 891, 895 (1994) (citations, brackets, ellipsis, and internal quotation marks omitted); <u>see also</u> <u>State v. Smith</u>, 106 Hawai`i 365, 372, 105 P.3d 242, 249 (App. 2004) ("Sufficient evidence to support a conviction can be established through the testimony of a single witness.  It is the province of the jury, not the appellate courts, to

>     determine the credibility of witnesses and the
>     weight of the evidence.") (citations omitted).
>
>          Accordingly, we hold that, "considered in the
>     strongest light for the prosecution[,]" there was
>     "substantial evidence" adduced at trial to support
>     the jury's verdict convicting Yamada on all three
>     counts.

Id. at 442, 173 P.3d at 589 (some citations omitted).

The ICA's analysis of Petitioner's sufficiency of the

evidence claim is neither contrary to nor an unreasonable

application of clearly established federal law.  Although it did

not cite the Supreme Court's ruling in Jackson, the ICA's

decision was consistent with the principles set forth in Jackson.

The ICA reviewed the evidence, drew all inferences in favor of

the State, and held that the evidence was strongly corroborative,

thus sufficient, to show that Petitioner committed the charged

offenses.  This holding necessarily incorporated the Jackson

inquiry and supports a finding that a rational trier of fact

could have found the essential elements of the crimes charged

beyond a reasonable doubt.

This Court need does not determine whether the evidence

established guilt beyond a reasonable doubt, see Payne v. Borg,

982 F.2d 335, 338 (9th Cir. 1992), but only "whether, 'after

viewing the evidence in the light most favorable to the

prosecution, any rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt.'"  See

id. (emphasis omitted) (quoting Jackson, 443 U.S. at 319).  The

32

Court FINDS that the evidence was sufficient for the jury to find the essential elements of the crimes of robbery in the first degree and assault in the first degree beyond a reasonable doubt and that the ICA's determination of this issue was neither contrary to nor an unreasonable application of federal law.  The Court therefore DENIES the first ground WITH PREJUDICE.

    **B.**    **Ground Two: Inadmissible "Bad Act" Evidence**

       In his second ground for relief, Petitioner asserts that the circuit court erred in allowing the State to present the evidence of the March 21, 2003 incident and Petitioner's mugshot in the photographic lineup.  [Amended Petition at 8.]  The circuit court ruled that the stipulation regarding the March 21, 2003 incident was relevant to show how police obtained the photograph of Petitioner and the baseball bat.  The circuit court instructed the jury as follows with respect to this evidence:

> Several times during the trial, I told you that certain evidence was allowed into this trial for a particular and limited purpose.  When you consider that evidence, you must limit your consideration to that purpose.
>
> The court has limited your consideration of the admission of Exhibit 28 relating to the incident on March 21, 2003, behind the University of Hawaii dormitories and it is only relevant to show the context in which law enforcement obtained the baseball bat and the photo of the defendant. There will be no further evidence nor examination on the issue by either party.

[12/2/03 Trans. at 14-15.]

1.   **March 21, 2003 Incident**

As to the March 21, 2003 incident, the ICA concluded that,

> the circuit court made a concerted effort to avoid prejudicing Yamada.  It admitted far less damaging evidence than it could have, and for a much narrower purpose.  We conclude that the circuit court did not abuse its discretion in admitting this evidence, with one exception.  The exception relates to the reference in the parties' stipulation to Yamada "holding an aluminum baseball bat in both hands" after being asked by security officer Texeira to retrieve the car's registration.  Although ambiguous, this reference could have been interpreted as suggesting that Yamada intended to assault the officer with the bat.  Evidence of this intended assault was of limited probative value, since the circumstances were different from those of the Diamond Head incident, and accordingly, we conclude that the introduction of this evidence was an abuse of discretion under [Haw. R. Evid. ("HRE")] Rule 403.  However, because of the ambiguous nature of the reference, the court's oral and written instructions limiting the jury's consideration of the information, and given the strength of the evidence against Yamada, we hold the error to be harmless beyond a reasonable doubt.

116 Hawai`i at 439, 173 P.3d at 586.

The ICA began its analysis by determining whether evidence of the events at the Honolulu Zoo and University of Hawai`i was, as the State argued, admissible for the broader purpose of establishing Yamada's identity as one of the perpetrators of the Diamond Head attack.  It noted that Haw. R. Evid. 404(b) closely tracks its federal counterpart, Fed. R. Evid. 404(b), except that "Rule 404(b) differs from [Federal

34

Rules of Evidence (FRE) Rule] 404(b) in that the latter does not list 'modus operandi.'" Id. at 434 n.9, 173 P.3d at 581 n.9 (quoting Commentary to Haw. R. Evid. 404). The ICA further explained that, "when evidence is offered for substantive reasons rather than propensity, a trial court must still weigh the potential prejudicial effects of the evidence against its probative value under [Haw. R. Evid.] Rule 403." Id. at 435, 173 P.3d at 582. It concluded that the evidence of the March 21, 2003 incident was probative of facts of consequence other than character and propensity, and that its probative value substantially outweighed the danger of unfair prejudice to Petitioner.

> Here, the March 21, 2003 attack at the Honolulu Zoo and the February 14, 2003 incident at the Diamond Head lookout share strikingly similar characteristics, including: (1) the victims were initially startled by loud, abusive shouting, and then overpowered with sudden violence, (2) the use of an aluminum baseball bat in commission of the crimes, (3) the similar times and close proximity of the offenses, and (4) the participation of two men in the attacks.

> . . . .

> Additionally, the fact that Yamada possessed an aluminum baseball bat at U.H. was relevant for another reason: it was probative of his "opportunity" to commit the crime at Diamond Head lookout. HRE Rule 404(b). . . .

> . . . .

> Accordingly, we conclude that evidence regarding the entire March 21, 2003 incident, including Yamada's subsequent apprehension at U.H.

and his possession of an aluminum baseball bat at
that time, was probative of facts of consequence
other than character and propensity, and hence
admissible under HRE Rule 404(b).

. . . .

. . . [T]he probative value of the Honolulu
Zoo incident and Yamada's subsequent apprehension
at U.H. was not substantially outweighed by the
risk of unfair prejudice.  There was strong
evidence that Yamada committed the robbery at the
Honolulu Zoo; indeed, Yamada had pleaded guilty to
that offense. . . .  There was a strong need for
the evidence, since Yamada offered an alibi
defense, and challenged the reliability of Yoza's
and Cookman's identifications of him.  While there
was some risk that the jury would be roused to
additional hostility against Yamada, we cannot say
that such risk "substantially outweighed" the
strong probative value of the evidence.

Id. at 437-38, 173 P.3d at 584-85.

The ICA's evidentiary ruling is not subject to federal

habeas review unless it violated federal law, either by

infringing upon a specific federal constitutional or statutory

provision or by depriving Petitioner of a fundamentally fair

trial.  See Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir.

1991).  Absent a showing that the admission of evidence was

arbitrary or so prejudicial as to render the trial fundamentally

unfair, a federal court will not overturn a state court's

decision to admit evidence on due process grounds.  Walters v.

Maass, 45 F.3d 1355, 1357 (9th Cir. 1995).

Petitioner fails to establish that the state court's

rulings violated Petitioner's rights under federal law.  Haw. R.

36

Evid. 403 provides that a court has the discretion to exclude relevant evidence that is otherwise admissible "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[8]  Clearly, the circuit court and the ICA considered these factors here.  Admission of evidence regarding the March 21, 2003 incident was neither arbitrary nor so prejudicial as to render the trial fundamentally unfair.

The Court notes that there was no evidence adduced that Petitioner was arrested on March 21, 2003 or that the bat was used in the commission of a crime.  In any event, with respect to evidence regarding the March 21, 2003 incident, the circuit court gave a specific limiting instruction before closing arguments, and again immediately after the prosecutor raised the issue in his closing argument, and it is presumed the jury adhered to the court's limiting instruction to consider the evidence for the purpose stated.  See Richardson v. Marsh, 481 U.S. 200, 210 (1987).

---

[8] At the time of Petitioner's trial and Yamada II, Haw. R. Evid. 403 was identical to Fed. R. Evid. 403.  See Haw. R. Evid. 403 commentary.  The language of Fed. R. Evid. 403 was amended in 2011 "as part of the restyling of the Evidence Rules" and were "stylistic only."  Fed. R. Evid. 403 advisory committee's note (2011 Amendments).

Moreover, in order to establish that the circuit court's erroneous evidentiary ruling entitles him to habeas relief, Petitioner must show that the error had a "substantial and injurious effect" on the verdict.  See Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 120 (2007) (affirming the application of "the Brecht standard of review in assessing the prejudicial impact of federal constitutional error in a state-court criminal trial" after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996).  Petitioner has not made such a showing as to the evidence of the March 21, 2003 incident.

### 2.  Mugshot

The ICA ruled that circuit court did not err in admitting Petitioner's mug shot from the photographic lineup because the photograph did not imply that Petitioner had a prior criminal record and was not propensity evidence.  The photographic lineup was composed of two rows, each consisting of three photographs of young men of similar age and appearance, and there were neither internal police markings, nor mugshot identification numbers on the photos.  Petitioner conceded that the State had a demonstrable need to introduce the photographic lineup.  The ICA concluded that the photographs themselves did not imply that Petitioner had a prior criminal record, and that the manner in which the photographs were introduced did not draw

38

particular attention to the source or implications of the photographs. Yamada II, 116 Hawai`i at 440-41, 173 P.3d at 587-88.

With respect to the photographic lineup as a whole, Petitioner has not demonstrated that the state court's evidentiary ruling infringed upon a specific federal constitutional or statutory provision or deprived him of a fundamentally fair trial. See Jammal, 926 F.2d at 919-20. Petitioner relied upon an alibi defense, arguing that he was not the perpetrator. Thus, the question of identification was central to the case and proof that the victim picked Petitioner out of a photographic lineup was relevant. The photographs implied neither that Petitioner had a criminal record nor that he was arrested following the March 21, 2003 incident. See Reiger v. Christensen, 789 F.2d 1425, 1430 (9th Cir. 1986) ("'The photographs were never referred to as "mugshots" and all police data was removed from them.' Thus, their introduction did not violate notions of fundamental fairness." (quoting Futrell v. Wyrick, 716 F.2d 1207, 1208 (8th Cir. 1983)). Nor did the manner in which the photographs were introduced amount to fundamental unfairness. See id. at 1430-31 ("[T]he manner in which the state introduced the photographic array in Reiger's case did not amount to fundamental unfairness. [T]he victim's ability to identify her assailant was a central issue. And . . . any prejudice

39

resulting from the manner of introduction did not outweigh the probative value of introducing the photographs.").

The Court FINDS that Petitioner has not established that the circuit court improperly admitted either his mug shot from the photographic lineup or the lineup as a whole, and the Court further FINDS that the ICA's rulings on these issues were neither contrary to nor an unreasonable application of federal law.  The Court therefore DENIES the second ground WITH PREJUDICE.

C.   **Ground Three: Prosecutorial Misconduct**

Petitioner's third ground is that the that the prosecutor intentionally violated the circuit court's order regarding the admissibility of the March 21, 2003 incident. According to Petitioner, the prosecutor improperly argued that the evidence of the earlier incident was propensity evidence. [Amended Petition at 9.]

During Respondents' closing argument, the prosecutor discussed the March 21, 2003 incident, in part, as follows:

> [PROSECUTOR]: Now, I want to move to five weeks from Valentine's Day to the day.  The Valentine's Day incident happened on a Friday, early morning.  March 21st, the incident behind the U.H. dormitories happened on a Friday morning both right around the same time, approximately 1:30 to two o'clock.  That brought – I've got more to say about that later, but that incident brought the police to the attention or brought Mr. Yamada to the attention of the police and they photographed him.

40

. . . .

. . . On [M]arch 21st, 2003, approximately at 2:30 a.m., Albert Texeira, the University of Hawaii security officer, accompanied by a female security officer, saw two males standing to the rear of a car in a University of Hawaii dormitory parking lot located at 2579 Dole Street.

All the locations are pretty close.  U.H. dormitory, Diamond Head lookout, Lindsey Johansen's house up on Waialae Iki, all within two or three miles of each other.

[DEFENSE COUNSEL]: Objection, your Honor.

THE COURT: Counsel, on Page 23, I have limited the jury's consideration of that stipulation only to show the context of how law enforcement got the bat and the photo so I'm going to have to sustain that objection respectfully.

[PROSECUTOR]: Your Honor, I'm asking that this stipulation can be used to prove identity.

[DEFENSE COUNSEL]: Objection, your Honor.

THE COURT: I've limited it to show the context and that's been my ruling from the get-go so you need to move along.

. . . .

[PROSECUTOR]: Yamada opened the car's passenger side front door, bent over, and reached into the car.  Texeira's flashlight was getting weak and he could not see clearly what Yamada was doing inside the car.  Yamada straightened up and as he did so, turned around to face Texeira. Texeira noticed that Yamada was now holding an aluminum baseball bat in both hands.  When the police arrived, Texeira briefed the police on what he had observed and done.

Whereupon, Honolulu police officers then took charge of Yamada and recovered the aluminum baseball bat shown in Exhibit 1 attached to the stipulation.  And later on March 21st, the police

41

took the photograph of Yamada that appears as photograph number three in the photographic arrays that were shown to Kaneda, Yoza, and Cookman. Again, we are asking you to look at this evidence so that you know how the police got ahold [sic] of Mr. Kaleokalani Yamada's photograph.

And, your Honor, may I argue – you know, I'm not hearing an objection. I'm just going to go ahead and argue that there are similarities between the two –

THE COURT: Counsel, I've ruled, I thought, from the beginning of the case, that this is irrelevant. It's not to be considered by the jury. It only shows the context on how they got this photograph.

[PROSECUTOR]: Your Honor, I'll move on.

THE COURT: You need to move on. The jury will disregard that particular Power Point and we'll make that part of the record so that counsel have it later on. Proceed.

[12/2/03 Trans. at 36-37, 44-47.]

Outside of the presence of the jury, the circuit court addressed the prosecutor's statements regarding the March 21, 2003 incident.

[PROSECUTOR]: Yes, your Honor. I would like to start out by apologizing to the court. I think I had a basic misunderstanding of what the court's ruling was on the behind the U.H. dormitory matter on March 21. I also apologize to [defense counsel] to the extent that I was wrong about this. I did not mean to go into an area where I wasn't supposed to go, but this was my understanding, Judge, based on the court's ruling in the motion in limine which was over several days.

I have a specific recollection of the court, when it made its initial ruling as to the stipulation, Exhibit 28, saying that this comes in

42

on the issue of identity for the purpose of
showing how the police obtained the picture of
Mr. Yamada and the baseball bat.  That was my
understanding.

Now, I think since then, the court has
narrowed that.  Based on that original
understanding that I had, I thought that it was
fair game to argue that it was circumstantial
identity evidence, which I still believe it
is. . . .

. . . .

I still just – I'm adamant that in the
court's initial ruling, you allowed it in on the
issue of identity because remember, we went
through that whole list of other things under
404(b) that it could go to, intent, motive,
preparation, lack of mistake.

. . . .

And the court indicated that it was coming in
on the issue of identity.

[Id. at 64, 67.]

The circuit court denied Petitioner's motion for a

mistrial.  On direct appeal, the ICA rejected Petitioner's

argument that the circuit court abused its discretion when it

denied his motion for a mistrial based on prosecutorial

misconduct.

"Allegations of prosecutorial misconduct are
reviewed under the harmless beyond a reasonable
doubt standard, which requires an examination of
the record and a determination of whether there is
a reasonable possibility that the error complained
of might have contributed to the conviction."
State v. Rogan, 91 Hawai`i 405, 412, 984 P.2d
1231, 1238 (1999) (internal quotation marks and
citations omitted).

43

"In order to determine whether the alleged
prosecutorial misconduct reached the level of
reversible error, we consider the nature of the
alleged misconduct, the promptness or lack of a
curative instruction, and the strength or weakness
of the evidence against defendant."  State v.
Agrabante, 73 Haw. 179, 198, 830 P.2d 492, 502
(1992) (citations omitted).

116 Hawai`i at 442-43, 173 P.3d at 589-90.  After reviewing

the circuit court's discussion of the matter, see infra

pages 11-13, the ICA ruled as follows:

We conclude that the prosecutor's conduct,
while improper, was unintentional and the result
of an ongoing misunderstanding of the court's
ruling.  Moreover, at the time the comments were
made, the circuit court immediately issued a
limiting instruction and ordered the jury to
disregard the inappropriate comments.  Yamada was
then given the opportunity to draft a specific
limiting instruction and have the statements
stricken.  However, in order to avoid calling
attention to the evidence, he opted not to.
Finally, as discussed above, there was ample
evidence to support the jury's verdict that Yamada
was guilty.

Accordingly, although the DPA's comments were
improper because they exceeded the bounds of the
court's rulings, they did not deprive Defendant of
his right to a fair trial.  Thus, because "[t]he
denial of a motion for mistrial is within the
sound discretion of the trial court and will not
be upset absent a clear abuse of discretion[,]"
State v. Lagat, 97 Hawai`i 492, 495, 40 P.3d 894,
897 (2002) (citation omitted), we hold that the
circuit court did not abuse its discretion in
denying Yamada's motion.

116 Hawai`i at 444, 173 P.3d at 591 (some citations omitted).

The ICA's analysis of Petitioner's prosecutorial misconduct claim

was neither contrary to nor an unreasonable application of

44

clearly established federal law.

In determining an assertion of prosecutorial misconduct on a writ of habeas corpus, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned[, t]he relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (citations and internal quotation marks omitted).  Under this standard, a petitioner must show that there exists a "reasonable probability that the result of the proceeding would have been different" absent the alleged impropriety.  Hein v. Sullivan, 601 F.3d 897, 905 n.4 (9th Cir. 2010).  "[T]he first issue is whether the prosecutor's remarks were improper and, if so, whether they infected the trial with unfairness."  Tak Sun Tan v. Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005).  Accepting that the prosecutor's comments regarding the March 21, 2003 incident were improper, the Court considers whether the prosecutor's statements during closing argument "infected the trial with unfairness."

The Court considers the weight of the evidence, the prominence of the comment in the context of the entire trial, whether the prosecutor misstated the evidence, whether the circuit court instructed the jury to disregard the improper statements, whether defense counsel invited the comment, and

45

whether defense counsel had an adequate opportunity to rebut the comment. See Hein, 601 F.3d at 914. In reviewing the prosecutor's comments about the March 21, 2003 incident, this Court must place the comments "in the context of the entire trial to evaluate whether its damaging effect was mitigated or aggravated." See id.

Considering the relevant factors, the Court finds that Petitioner has not demonstrated that the prosecutor's improper comments affected the fairness of the trial. See Darden, 477 U.S. at 181 n.13. As the ICA recognized, the prosecutor's comments appear to be the result of an ongoing misunderstanding of the court's ruling on the purpose of allowing evidence of the March 21, 2003 incident, and not an intentional attempt to subvert the circuit court's ruling in limine. Petitioner has provided no evidence to the contrary. Immediately after the improper comments, the circuit court issued a limiting instruction and ordered the jury to disregard the inappropriate comments. Petitioner declined the circuit court's offer to draft a specific limiting instruction and have the statements stricken. Moreover, as discussed previously, the evidence was sufficient for the jury to find that Petitioner committed the crimes of robbery and assault in the first degree beyond a reasonable doubt. Thus, in light of the substantial evidence against Petitioner that was presented at trial, there is no "reasonable

46

probability that the result of the proceeding would have been different" had the prosecution not made the allegedly improper remarks in its closing argument.  See Hein, 601 F.3d at 905 n.4.

The Court FINDS that the prosecutor's comments did not so infect the trial with unfairness as to make the resulting conviction a denial of due process, see Darden, 477 U.S. at 181, and that the ICA's determination of this issue was neither contrary to nor an unreasonable application of federal law.  The Court therefore DENIES the third ground WITH PREJUDICE.

D.   **Ground Four: Juror Misconduct**

Petitioner's final ground is that a juror slept through up to twenty percent of defense counsel's closing argument. [Amended Petition at 11.]  Under the Sixth Amendment, a criminal defendant is guaranteed the right to be tried by a fair and impartial jury.  Duncan v. Louisiana, 391 U.S. 145, 149 (1968); Grotemeyer v. Hickman, 393 F.3d 871, 876-877 (9th Cir. 2004).  An impartial jury must be "capable and willing to decide a case solely on the evidence before it."  United States v. Olano, 507 U.S. 725, 738 (1993) (quoting Smith v. Phillips, 455 U.S. 209, 217, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982)).  The presence of a sleeping juror during trial does not, per se, deprive a defendant of the right to due process, a fair trial, or an impartial jury. See, e.g., United States v. Olano, 62 F.3d 1180, 1189 (9th Cir. 1995) ("[T]he presence of all awake jurors throughout an entire

47

trial is not an absolute prerequisite to a criminal trial's ability to reliably serve its function as a vehicle for determination of guilt or innocence.  A single juror's slumber thus is not per se plain error." (citation and internal quotation marks omitted)); United States v. Springfield, 829 F.2d 860, 864 (9th Cir. 1987) (no violation of due process or the right to a fair trial and impartial jury when juror slept through part of testimony).  Habeas relief is available for juror misconduct only when a petitioner demonstrates that he suffered prejudice as a result.  See Fields v. Brown, 503 F.3d 755, 781 (9th Cir. 2007).  Petitioner has not made any showing of prejudice in the instant case.

Moreover, the juror in question testified that he was "drifting in and out" through "[m]aybe 20 percent at the most" of defense counsel's closing.  [12/3/03 Trans. at 23.]  The circuit court asked the juror: "What would have been the longest time that you would have gone to sleep?"  The juror responded: "Maybe ten, 15 seconds.  I'm not sure."  [Id. at 21.]  Petitioner has not presented any new evidence that the juror in question was in fact sleeping or being inattentive for longer periods than he admitted to and, absent such "clear and convincing evidence," the findings made in the state court level concerning the juror's ability to serve are presumed to be correct.  See 28 U.S.C. § 2254(e)(1).  Petitioner is not entitled to federal habeas

48

relief on this claim because the state court's findings that Petitioner's rights were not violated was neither contrary to nor an unreasonable application of clearly established federal law as defined by the Supreme Court.  See Williams, 529 U.S. at 402-04, 409.  The Court therefore DENIES the fourth ground WITH PREJUDICE.

## V.   Certificate of Appealability

Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  A certificate of appealability may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

In order to obtain a certificate of appealability, a petitioner is required to show that reasonable jurists could debate whether the issues should have been resolved differently or are "adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 483 (2000) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983), *superseded on other grounds by* 28 U.S.C. § 2253(c)(2)); see also Mendez v. Knowles, 556 F.3d 757, 771 (9th Cir. 2009).  The district court must indicate which specific issue or issues satisfy the standard for issuing a certificate, or state its reasons for denying a

certificate.  <u>United States v. Asrar</u>, 116 F.3d 1268, 1269 (9th Cir. 1997).

The Court has carefully reviewed whether Petitioner waived any of the issues in his Amended Petition and whether his claims otherwise have merit.  The Court FINDS, based on the analysis set forth above, that Petitioner has not made a substantial showing of the denial of a constitutional right.  The instant order is a decision on the merits, and this Court FINDS that reasonable jurists would not find that the denial of the four grounds listed in the Amended Petition was debatable or wrong.  Accordingly, this Court DENIES a certificate of appealability.  <u>See</u> 28 U.S.C. § 2253(c)(2).

<u>**CONCLUSION**</u>

On the basis of the foregoing, this Court DENIES Petitioner Kaleokalani Yamada's Amended Petition.  The Court further DENIES a certificate of appealability.

IT IS SO ORDERED.

DATE AT HONOLULU, HAWAII, July 31, 2012.



    /S/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**KALEOKALANI YAMADA V. TODD THOMAS, ETC., ET; CIVIL 09-00298 LEK-RLP; ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING A CERTIFICATE OF APPEALABILITY**